UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------X

APRIL DEARDEN,

                    Plaintiff,                        15 Civ. 7628

        -against-                                     OPINION

GLAXOSMITHKLINE LLC., d/b/a/ GSK,
GLAXOSMITHKLINE CONSUMER
HEALTHCARE HOLDINGS (US) LLC.,
d/b/a GSK,

                    Defendants.

------------------------------------X

A P P E A R A N C E S:



USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 9/14/17

### Attorneys for Plaintiff

FRANK & ASSOCIATES, P.C.
500 Bi-County Blvd., Suite 465
Farmingdale, NY 11735
By:  Patricia L. Boland, Esq.


### Attorneys for Defendants

MORGAN, LEWIS & BOCKIUS LLP
101 Park Avenue
New York, NY 10178
By:  Blair J. Robinson, Esq.
     Jason J. Ranjo, Esq.

**Sweet, D.J.**

Defendants GlaxoSmithKline, LLC, doing business as GSK ("GSK") and GlaxoSmithKline Consumer Healthcare Holdings (US) LLC (together with GSK, the "Defendants") have moved pursuant to Federal Rule of Civil Procedure 56 to dismiss the complaint of Plaintiff April Dearden ("Dearden" or the "Plaintiff") for her retaliation and discrimination claims under the Family and Medical Leave Act ("FMLA") and New York Human Rights Law ("NYSHRL") (the "Amended Complaint," Dkt. No. 26). Based upon the facts and conclusions set forth below, the Defendants' motion for summary judgment is granted, and the Amended Complaint is dismissed.

## I. **Prior Proceedings**

Plaintiff filed her Complaint on September 28, 2015, and, pursuant to a stipulation between the parties, filed an Amended Complaint on September 24, 2016. (See Dkt. Nos. 1, 24, 26.) In Plaintiff's Amended Complaint, Plaintiff alleged retaliation for taking FMLA in violations of the statute (Count I), discriminatory termination based on a known or perceived disability in violation of the NYSHRL (Counts II and III), and

retaliation in violation of the NYSHRL (Count IV).[1] (See Amended
Complaint ¶¶ 54-70.) Discovery has been completed.

On April 14, 2017, Defendants moved for summary judgment.
(Dkt. No. 30.) The instant motion was heard and marked fully
submitted on June 21, 2017.

## II. **The Facts**

The facts have been set forth in Defendants' Statement of
Undisputed Material Facts, (Dkt. No. 32), and Plaintiff's Rule
56.1 Counter-Statement in Opposition, (Dkt. No. 37). The facts
are not in dispute except as noted below.

GSK is a global pharmaceutical, vaccine, and consumer
wellness company. (Declaration of Sylvetta Harris dated April
13, 2017 ("Harris Decl.") ¶ 2, Dkt. No. 34; Pl. Dep. 19:9-18.[2])

[1]    Plaintiff has not disputed Defendants' opposition to her
NYSHRL retaliation claim and, in motion papers for the instant
motion, has stated that that claim is withdrawn. (Pl.'s Mem. in
Opp. at 1 n.1, Dkt. No. 36); see Quintero v. Rite Aid of N.Y.,
Inc., No. 09 Civ. 6084 (JLC), 2011 WL 5529818, at *19 (S.D.N.Y.
Nov. 10, 2011) (collecting cases). Accordingly, Defendants'
motion for summary judgment as to the Amended Complaint's Count
IV is granted.

[2]    Citations to "Pl. Dep." refer to the deposition of April
Dearden dated November 7, 2016, deposition pages for which were

2

Plaintiff began working for GSK as a pharmaceutical sales representative in 2002. (Pl. Dep. 13:2-3, 16-3-10.)

Plaintiff's employment with GSK was governed by GSK's Code of Conduct policy, which addressed conflicts of interest and stated, in relevant part:

> We must all be free from actual or potential conflicts of interest. A conflict of interest occurs whenever the prospect of direct or indirect personal gain may influence or appear to influence our judgment or actions while conducting GSK business.
>
> * * *
>
> It is important to avoid not only an actual conflict of interest, but also the appearance of a conflict in the performance of you job. You must promptly disclose to a manager, supervisor or a Compliance Office, any situation that may involve a potential or actual conflict of interest and ask for appropriate guidance before taking any action (in accordance with local privacy laws).

(Harris Decl., Ex. A, at 9.) GSK's Code of Conduct Policy also noted that any failure to comply with its provisions will subject an employee "to disciplinary action up to and including termination from employment." (Id. at 5.)

---

submitted with the Declaration of Jason J. Ranjo dated April 14, 2017 ("Ranjo Decl."), Ex. A, Dkt No. 33, and the Affirmation of Patricia L. Boland dated April 28, 2017 ("Boland Aff.), Ex. A, Dkt. No. 38, and incorporates the exhibits referenced therein.

In July 2013, as part of a corporate restructuring, Plaintiff began reporting to District Sales Manager Lauren Phillips ("Phillips"). (Pl. Dep. 18:14-23; Ranjo Decl., Ex. B ("Phillips Dep."), at 14:4-7.) While reporting to Phillips, Plaintiff worked in GSK's pulmonary and primary care pharmaceuticals line of business. (Pl. Dep. 20:20-22:3.) Plaintiff's job responsibilities included calling healthcare providers within her geographic territory, planning and recording sales calls, reporting expenses, and studying for tests necessary to promote the products to which she was assigned. (Pl. Dep. 29:12-32:9.)

Plaintiff was assigned the Middletown territory, which covered areas of Orange County, New York, and included the towns of Middletown, Goshen, Fishkill, Yorktown, Warwick, and Port Jervis. (Pl. Dep. 22:4-25; Phillips Dep. 50:10-12.) Plaintiff shared responsibility for the Middletown territory with her sales partner, Ife-Marie LaFontant ("LaFontant"). (Pl. Dep. 25:14-26:16.)

Prior to 2009, Plaintiff obtained a certification to work as a Corporate Wellness coach and, by 2010, had started her own health and wellness business, New Normal Lifestyles ("NNL").

(Pl. Dep. 35:2-36:18, 38:2-16.) Between 2010 and 2014, Plaintiff worked with clients on nutrition and other issues related to personal health and wellness independent of her sales work with GSK. (Pl. Dep. 36:24-38:12.) Sometime in either 2011 or 2012, Plaintiff received a certification in nutrition. (Pl. Dep. 10:17-12:24.)

Through her NNL business, Plaintiff also provided educational services related to health and wellness to colleges, including Bard College and Empire State College. (Pl. Dep. 37:7-9, 38:17-22, 58:3-6, 75:4-13.) For example, from July to December 2013, Plaintiff taught a weekly health and nutrition Wellness Course at Bard College that started at noon on Wednesdays and lasted one hour. (Pl. Dep. 61:13-64:12, 67:8-16, 72:6-25.) Bard College was located outside of Plaintiff's GSK territory, and such classes caused Plaintiff to be outside her assigned GSK territory and performing her assigned GSK work for between one to two hours each session, according to Plaintiff, (Pl. Dep. 66:6-8), or greater than two hours, according to Defendants, (Pl. Dep. 63:4-65:16, 66:2-13). The parties do not dispute that during Plaintiff's eighteen weeks of teaching at Bard College, Plaintiff sent and received emails related to her NNL business and may have prepared for teaching the Bard College

classes during her GSK working hours. (Pl. Dep. 74:7-23, 84:5-85:87:24.) After completing two nine-week sessions, Plaintiff chose to stop teaching the Wellness Course. (Pl. Dep. 75:13-78:25.)

Plaintiff also lectured on nutrition at Empire State College on at least one occasion in April 2014. (Pl. Dep. 58:3-59:5-18.) The parties dispute the degree to which Plaintiff prepared for her lecture during work hours prior to the class, and Plaintiff does not recall when she prepared. (Id.)

Plaintiff operated a blog to promote her NNL business, on which she provided advice on health issues, including eating properly, stress management, and general wellness tips. (Pl. Dep. at 40:18-43:6, 45:16-21, 48:23-49:8.) Between 2010 and 2014, Plaintiff updated the NNL blog several times a month, although the parties contest precisely how often Plaintiff generated new content and how much time, if any, was spent updating the blog during Plaintiff's regular GSK working hours. (Pl. Dep. 42:10-43:25.) Plaintiff also discussed NNL with GSK customers during her sales calls. (Pl. Dep. 55:14-57:10.)

On January 16, 2014, Plaintiff published a book related to her NNL business entitled "8 Weeks to Your New Normal Lifestyle." (Pl. Dep. 46:16-18, 49:9-50:12.) Plaintiff's book provided readers with a journal for logging their weekly food habits and "new healthy habit[s]" they could incorporate into their meal plans. (Pl. Dep. 50:13-25.) Plaintiff wrote the book herself over the course of about one year, starting in early 2013. (Pl. Dep. 51:13-20.) Plaintiff promoted her book on social media, including Facebook, while waiting to see physicians during her assigned GSK sales calls. (Pl. Dep. 53:7-17.)

In March 2014, Plaintiff began working as an independent contractor for AdvoCare International, L.P. ("AdvoCare"), a nutrition and supplement company that promoted individual health and wellness. (Pl. Dep. 171:2-173:10, 174:22-175:12.) Plaintiff was an independent distributer of AdvoCare products in four general areas: weight management, performance, energy, and overall wellness. (Pl. Dep. 174:14-23; 179:14-182:11.) Plaintiff sold AdvoCare products from March 2014 throughout the remainder of her employment with GSK. (Id.) Plaintiff never spoke to GSK physicians about AdvoCare. (Pl. Dep. 186:22-25.)

Plaintiff had her own webpage as part of AdvoCare's website, on which she wrote, in relevant part:

> For 12 years I worked for a large pharmaceutical company. Over the years the job became more demanding, my compensation went down and every quarter there were threats of layoffs. Until the day finally came and I was let go. Thanks to AdvoCare that day was one of the best things that ever happened to me. I had begun building my Plan B four months before I was let go. I've been building my AdvoCare business every day since.

(Pl. Dep., Ex. 10.) Plaintiff has stated that she had been working towards becoming an AdvoCare "Advisor" for several months prior to her GSK termination. (Pl. Dep. 178:2-179:18.)

Plaintiff discussed "everything [she] was doing" with NNL and AdvoCare with LaFontant. (Pl. Dep. 44:9-45:4, 46:4-11, 47:2-9.) Plaintiff also discussed NNL with Ken Rooney, another GSK sales representative. (Pl. Dep. 47:13-48:22, 182:16-184:25.) Plaintiff never disclosed her NNL business or AdvoCare position to Phillips or any other member of GSK management before taking medical leave. (Pl. Dep. 47:13-48:22, 175:25-176:7.)

On April 30, 2014, Plaintiff visited her primary care physician, Dr. Anita V. Pavels ("Pavels") after experiencing what she described as "stress related heart palp[itations], dizziness, sleep problems" and shortness of breath. (Ranjo

Decl., Ex. C; see Pl. Dep. 128:22-129:17.) Pavels referred

Plaintiff to a cardiovascular specialist to undergo testing of

her heart, which ultimately revealed no heart-related issues and

concluded a diagnosis of stress and anxiety. (See Ranjo Decl.,

Ex. D; Pl. Dep. 129:3-23, 132:13-20.)


On or around May 12, 2014, Plaintiff arrived approximately

forty-five minutes late to a physician call where she was

supposed to meet Phillips. (Pl. Dep. 137:12-138:13; Phillips

Dep. 32:20-33:11.) According to Defendants, Plaintiff began

crying and explained to Phillips that she was experiencing

stress related to her job; Phillips advised Plaintiff that if

Plaintiff was unable to conduct the sales call, she should go

home for the day and consider seeking help from a doctor or

GSK's Employee Health Management. (Pl. Dep. 138:15-139:22;

Phillips Dep. 31:23-32:11.) Plaintiff contends that, upon

arriving to the call, Phillips yelled at Plaintiff for being

late, which caused Plaintiff to cry. (Pl. Dep. 138: 15.)

Phillips stated she did not understand why Plaintiff was

behaving that way, to which Plaintiff explained her stress

levels were very high; Phillips responded: "I don't understand.

High performing reps find workarounds. I can't get why you can't

do this," to which Plaintiff said she needed Phillips to

"understand and to help [her]." (Pl. Dep. 136:3-2, 138:15-139:22.)

On or around May 14, 2014, Plaintiff contacted GSK's Human Resources Department and requested medical leave because "she needed . . . to take some time for herself" due to work-related stress. (Pl. Dep. 140:10-20.) Plaintiff also submitted a Short-Term Disability Benefit Statement from Pavels, on which Pavels wrote that Plaintiff's "current physical limitations and impairments" were that Plaintiff was "unable to perform [her] job duties." (Harris Decl., Ex. B.) GSK granted Plaintiff leave under the FMLA on June 2, 2014, effective May 19, 2014. (Harris Decl. ¶ 4.)

Shortly after learning that Plaintiff would be taking FMLA leave, Phillips sent an email to GSK's Human Resources and wrote that, "When it rains, it pours." (Boland Aff., Ex. H.) Defendants note that Phillips was referring in that email to a different employee who had received negative performance reviews at the same time Plaintiff went out on leave and that, "everything was happening at one time." (Phillips Dep. 30:3-31:17.) In June 2014, two of Phillips's other sales

representatives also were out on medical leave; both are still employed by GSK. (Phillips Dep. 51:13-52:2.)

On or around June 3, 2014, LaFontant informed Phillips that Plaintiff had been operating her own health and wellness businesses, NNL. (Phillips Dep. 48:25-49:4, 40:22-41:24.) LaFontant also told Phillips that Plaintiff had taught classes at a local college during GSK work hours. (Phillips Dep. 41:11-24.) Phillips reported this information to her manager, Regional Vice President of Sales Sean McLoughlin, who advised Phillips to contact GSK's Integrity Hotline. (Id.)

On June 4, 2014, Phillips called the Integrity Hotline and repeated the information she had learned from LaFontant. (Phillips Dep. 40:22-42:7.) Defendants contend that Phillips suspected that Plaintiff's side business could present a conflict of interest with her job for GSK, particularly given that Plaintiff was operating NNL during GSK work hours. (Phillips Dep. 41:17-42:4.) Plaintiff contends that Phillips reported Plaintiff "[b]ecause [Plaintiff] was employed by GSK to perform her role as a sales representative and not have other jobs while doing so. It seems wrong." (Phillips Dep. 41:25-

11

43:4.) The matter was referred to Kevin Ryan ("Ryan"), Director of GSK's Corporate Investigations Team. (Harris Decl. ¶ 5.)

On June 12, 2014, Plaintiff began psychiatric treatment with Dr. William H. Hartwig ("Hartwig"), a clinical psychologist. (Ranjo Decl., Ex. E.) Plaintiff saw Hartwig approximately once per week during her leave, during which time Hartwig did not diagnose Plaintiff with any mental or physical conditions, other than noting at times that she had problems with "anxiety," "depression," and "compulsive behavior." (Pl. Dep. 145:24-150:25, 155:8-16; see Boland Aff., Ex. L.)

Just before returning from medical leave, Plaintiff tried out for the television show "Survivor" at Mohegan Sun in Connecticut. (Pl. Dep. 97:24-100:3.) Plaintiff did not inform anyone at GSK that she tried out for the show. (Pl. Dep. 100:24-101:5.) Plaintiff states that she tried out based on encouragement of her therapist who told Plaintiff to "do things that were fun." (Pl. Dep. 100:8-12.)

On August 20, 2014, Plaintiff requested a transition plan in advance for her return to work. (Pl. Dep. 116:12-117:8; Phillips Dep. 42:18-44:2.) Phillips provided the requested plan

12

and a "to do" list for Plaintiff upon her return, both actions
Phillips performed for subordinates returning from any type of
leave of absence. (Phillips Dep. 42:14-43:7, 45:8-46:4.) Aside
from Phillips, the only other contact Plaintiff had with GSK
during her leave was with a third-party leave administrator.
(Pl. Dep. 115:11-21.)

On August 25, 2014, Plaintiff returned from her FMLA leave
without any restrictions per Hartwig's direction. (Pl. Dep.
159:9-10.) After returning to work, Plaintiff received treatment
from Hartwig about once every one or two months and stopped
seeing him altogether at some point in 2014, which Plaintiff
claims was due to her loss of health insurance coverage
following her termination from GSK. (Pl. Dep. 159:8-160:25,
161:14-23.) Plaintiff also claims that upon returning to work,
Phillips began micromanaging Plaintiff's day, requiring
Plaintiff to detail her activities, as well as take assessment
exams demonstrating knowledge of various new products which
Plaintiff states were scheduled at inconvenient times. (Pl. Dep.
109:4-17, 118:19-119:24; Boland Aff., Ex. M.)

On September 10, 2014, Ryan and another member of GSK's
Corporate Investigations Team, Benjamin Byrne, interviewed

13

Plaintiff as part of their investigation. (Pl. Dep. 89:24-90:9, 94:15-95:3.) During Plaintiff's interview, she provided, in relevant part, the following responses:

- When asked whether what "hours during the day she was expected to work" as a GSK Sale Representative, Plaintiff responded: "They vary in the field 8:30 AM – 5:00 PM but then I also work weekends and evening with dinner programs. . . . I work 8:30 AM – 5:00 PM during the week." (Pl. Dep. 94:15-96:15; Boland Aff., Ex. N.)

- When "asked how many calls per day she was required to make," Plaintiff responded that she was required to make "8" calls per day as "an average." (Boland Aff., Ex. N)

- When "asked if she is the principal executive officer of a business titled "New Normal Lifestyle INC," Plaintiff responded: "Yes. It was established last year and provides nutritional counseling services, it doesn't have any products. I always conduct business for it in the evenings and on weekends." (Id.)

- Plaintiff admitted that she never reported her side business to GSK Human Resources. (Id.)

- When asked whether she "ever taught or conducted NNL[ ] business at a Community College or higher education institution," Plaintiff responded: "I don't know." (Id.)

14

- Plaintiff admitted that she "led a break out session" at Empire State College on April 30, 2014, to which Plaintiff added that he meant to note further that the break out session itself was not during GSK work hours. (Id.)

- Plaintiff admitted that both her GSK job and her NNL business "pertain to health," although Plaintiff added further that they pertained to different aspects of health. (Id.)

- Plaintiff admitted that she wrote a book related to her NNL business. (Id.)

- When asked whether "she had ever had discussions with customers about her NNL[] business," Plaintiff responded: "I don't know all of the conversations I have. There are personal conversations that occur between me and the HCP's to build rapport. It has happened where in those conversations my business has come up and it has been discussed." (Id.)

- When "asked if she could specifically recall which customers she had conversations about her NNL[] business," Plaintiff responded: "No." (Id.)

On September 12, 2014, Ryan advised Plaintiff by email that his investigation was complete and provided her with a copy of

15

the transcript from his September 10, 2014, interview of her. (Pl. Dep. 94:15-96:15.) Ryan further advised that while "the investigation process [was] completed[,] [his] report [would] be reviewed by the appropriate level of HR management to determine final disposition." (Id.) That same day, Plaintiff responded by providing "revisions" to the transcript of her interview and indicating that she had sought "legal counsel." (Id.)

On September 15, 2014, Ryan issued a final report. (See Harris Decl., Ex. C.) Mr. Ryan's report concluded, *inter alia*, that Plaintiff:

- was knowledgeable of GSK Conflict of Interest policies," (id.);
- acknowledged that she owned NNL, which "was a health field related business," (id.);
- "never reported her business to GSK Human Resources, Compliance Officer and/or management team," (id.);
- "had conversations with GSK [health care provider] customers about her [NNL] business during GSK business hours," (id.);
- "has utilized social networking outlets (Facebook) for personal reasons during GSK business hours," (id.); and

16

- "participated in a try out for the TV game show 'Survivor' while out on [short term disability]," (id.).

Subsequent to that review, GSK Human Resources Manager Sylvetta Harris ("Harris") contacted Bard College and confirmed that Plaintiff had taught there for about one to one-and-one-half hours every Wednesday from September to December 2013. (Harris Decl., Ex. D.) Around this time, Defendants also claim that Plaintiff threatened Phillips, which resulted in Phillips refusing to go on a ride-along with Plaintiff, a comment that Plaintiff denies making. (See Boland Aff., Ex. O; Pl. Dep. 120:11-15, 124:12-125:8.)

On September, 17, 2014, Plaintiff called GSK's Employee Relations Center to complain that Phillips had been treating her harshly because she had taken medical leave. (Pl. Dep. 121:4-122:25.) Plaintiff complained that Phillips had been more critical of her work and had been managing her more closely since returning from leave, including making a comment about how Plaintiff was "in second gear" since her return and canceling a ride-along. (Pl. Dep. 122:7-25, 125:17-128.) At the time, the parties dispute whether Plaintiff believed that Phillips initiated the compliance investigation into Plaintiff's NNL

17

business. (Pl. Dep. 89:11-19.) Harris investigated Plaintiff's complaint and, after interviewing Phillips, found no evidence to support a conclusion that Plaintiff was being harassed by her manager. (Harris Decl. ¶ 7.)

On October 21, 2014, Ryan's final report was submitted to GSK's Employee Relations Advisory Team ("ERAT") for review in accordance with GSK procedures. (Harris Decl. ¶ 8.) The ERAT was comprised of members of GSK's Employee Relations Department, among others, and did not include Phillips or any other managers with direct supervisory authority over Plaintiff. (Id.)

After reviewing Ryan's final report and the outcome of Harris's interview of Bard College, the ERAT concluded that Plaintiff had violated GSK policy prohibiting actual or potential conflicts of interest and recommended that Plaintiff's employment be terminated. (Harris Decl. ¶ 10.)

On or about October 22, 2014, Harris relayed the ERAT's recommendation to Phillips and McLoughlin who accepted the recommendation and, on December 5, 2015, communicated the termination decision to Plaintiff in person. (Harris Decl. ¶¶ 11-12; Pl. Dep. 102:22-105:9.)

18

## III. **Applicable Standard**

Summary judgment is appropriate only where "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The relevant inquiry on application for summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 251-52. A court is not charged with weighing the evidence and determining its truth, but with determining whether there is a genuine issue for trial. Westinghouse Elec. Corp. v. N.Y.C. Transit Auth., 735 F. Supp. 1205, 1212 (S.D.N.Y. 1990) (quoting Anderson, 477 U.S. at 249). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson, 477 U.S. at 247-48 (emphasis in original).

19

Courts must exercise "an extra measure of caution" in determining whether to grant summary judgment in employment discrimination cases "because direct evidence of discriminatory intent is rare and such intent often must be inferred from circumstantial evidence . . . ." Schiano v. Quality Payroll Sys., Inc., 445 F.3d 597, 603 (2d Cir. 2006) (internal quotation marks omitted). Nevertheless, "a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment," Holcomb v. Iona Coll., 521 F.3d 130, 137 (2d Cir. 2008), and "summary judgment remains available for the dismissal of discrimination claims in cases lacking genuine issues of material fact," McLee v. Chrysler Corp., 109 F.3d 130, 135 (2d Cir. 1997).

## Defendants' Motion for Summary Judgment is Granted

Plaintiff has several claims under her Amended Complaint which remain to be considered on Defendants' motion for summary judgment: Plaintiff's claim of retaliation for taking FMLA leave in violations of the statute (Count I), and Plaintiff's claims of discriminatory termination based on a known or perceived disability in violation of the NYSHRL (Counts II and III). (See Amended Complaint ¶¶ 54-70.) As the facts described above

20

establish, Plaintiff cannot maintain claims for any of the Amended Complaint's charges, and Defendants' motion is accordingly granted.

### i.    FMLA Retaliation Has Not Been Established

Under the FMLA, it is unlawful for an "employer to interfere with, restrain, or deny the exercise of or the attempt to exercise," FMLA rights. 29 U.S.C. § 2615(a)(1). Claims of retaliation, such as made by Plaintiff here, are analyzed under the burden-shifting framework laid out in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Under McDonnell Douglas, a plaintiff must first establish a *prima facie* case for retaliation by showing "that 1) he exercised rights protected under the FMLA; 2) he was qualified for his position; 3) he suffered an adverse employment action; and 4) the adverse employment action occurred under circumstances giving rise to an inference of retaliatory intent." Potenza v. City of N.Y., 365 F.3d 165, 168 (2d Cir. 2004).

If a plaintiff makes out a *prima facie* case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason" for the adverse actions. McDonnell

Douglas, 411 U.S. at 802. The defendant must provide evidence adducing a nondiscriminatory explanation for the adverse employment action.

If a nondiscriminatory explanation for the adverse action is established, "the burden shifts back to the plaintiff to demonstrate by competent evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." Patterson v. Cnty. of Oneida, 375 F.3d 206, 221 (2d Cir. 2004) (internal quotation marks omitted). Specifically, to rebut a defendant's explanation, the Second Circuit has stated that a plaintiff must "produce not simply 'some' evidence, but 'sufficient evidence to support a rational finding that the legitimate, nondiscriminatory reasons proffered by the employer were false, and that more likely than not [discrimination] was the real reason for the discharge." Van Zant v. KLM Royal Dutch Airlines, 80 F.3d 708, 714 (2d Cir. 1996); see also Graziadio v. Culinary Inst. of Am., 817 F.3d 415, 429 (2d Cir. 2016) (citing Van Zant, 80 F.3d at 714).

### a. Plaintiff's *Prima Facie* Case Has Not Been Made

Plaintiff argues retaliation by Defendants following her return from FMLA leave by pointing to several actions taken by Phillips, including: instructing Plaintiff to complete a "to do" list; requiring Plaintiff to submit weekly reports; providing Plaintiff with a transition plan; sending her curt emails; accusing her of being "stuck in second gear;" and cancelling a previously scheduled ride-along. (See Amended Complaint ¶¶ 23, 24, 27, 41, 42, 50-52.) Plaintiff also supports her *prima facie* case by pointing to the timing between Plaintiff taking FMLA leave and the instigation of GSK's investigation into Plaintiff and her side businesses. (See Pl.'s Mem. of Law in Opp. ("Pl.'s Opp.") at 10-11, Dkt. 36.) The parties do not dispute the first two prongs of the *prima facie* showing, that Plaintiff exercised her FMLA rights or was qualified for her position. However, Defendants contend that several events Plaintiff points to are not adverse employment action, failing the third prong, and that, overall, the examples do not create an inference of retaliatory intent, failing the fourth prong. After a review of the undisputed facts, Plaintiff has not established her necessary *prima facie* showing.

The Second Circuit has held that, "[f]or purposes of the FMLA's anti-retaliation provision, a materially adverse action is any action by the employer that is likely to dissuade a reasonable worker in the plaintiff's position from exercising his legal rights." Millea v. Metro-N. R.R., 658 F.3d 154, 164 (2d Cir. 2011). Examples of a materially adverse employment action include "a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities," Sanders v. N.Y.C. Human Res. Admin., 361 F.3d 749, 755 (2d Cir. 2004) (citation omitted), or a "formal reprimand, Millea, 658 F.3d at 165. The standard must be objective; the test is whether a "reasonable" employee would be deterred, and does not take into consideration a plaintiff's "unusual subjective feelings." Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68-69 (2006). "[P]etty slights, minor annoyances, and simple lack of good manners will not give rise to actionable retaliation claims." McAvey v. Orange-Ulster BOCES, No. 07 Civ. 11181 (RWS), 2012 WL 161839, at *3-*4 (S.D.N.Y. Jan. 18, 2012) (internal quotation marks omitted) (quoting Millea, 658 F.3d at 165).

The majority of Plaintiff's allegations, aside from her termination, do not constitute adverse employment actions.

24

Plaintiff has claimed, *inter alia*, that Phillips sent Plaintiff rude emails, complained about Plaintiff's work performance, micromanaged Plaintiff and Plaintiff's schedule, required Plaintiff to engage in product knowledge assessments at inconvenient times, and canceled ride-alongs with Plaintiff. Such actions are not so harmful or materially adverse as to "well dissuade a reasonable worker from making or supporting a charge of discrimination." Burlington N., 548 U.S. at 57. Rather, they are the kinds that courts in this circuit have repeatedly found not to constitute adverse actions. See Rivera v. Orange Cty., No. 10 Civ. 9134 (VB), 2013 WL 812016, at *9 (S.D.N.Y. Mar. 5, 2013) (rejecting allegations of adverse action when plaintiff alleged that manager discriminated "by more closely supervising and 'micro-managing' him, excluding him from meetings, assigning him more menial tasks, and generally making him feel isolated at work"); Milne v. Navigant Consulting, No. 08 Civ. 8964 (NRB), 2010 WL 4456853, at *8 (S.D.N.Y. Oct. 27, 2010) (holding that "retaliation such as her supervisor's 'unavailability,' 'apparent avoidance,' 'micromanagement,' 'harsh, unsupported criticism,' and intentional creation of conflict with another high-level employee" did not constitute adverse actions); Smalls v. Allstate Ins. Co., 396 F. Supp. 2d 364, 371 (S.D.N.Y. 2005) ("[B]eing yelled at, receiving unfair

criticism, receiving unfavorable schedules or work assignments .
. . do not rise to the level of adverse employment action")
(citation omitted).

Even if Plaintiff had shown adverse actions other than
termination, the circumstances alleged do not give rise to an
inference of retaliatory intent. An inference of retaliation can
be established: "(i) indirectly through a showing that the
protected activity was followed closely by discriminatory
treatment, commonly known as 'temporal proximity;' (ii)
indirectly through other evidence such as disparate treatment of
similarly-situated employees; or (iii) directly through a
showing of evidence of retaliatory animus toward plaintiff by
defendant." Alexander v. Bd. of Educ. of City Sch. Dist. of City
of N.Y., 107 F. Supp. 3d 323, 328-29 (S.D.N.Y. 2015) (citing
Carr v. WestLB Admin., Inc., 171 F. Supp. 2d 302, 309 (S.D.N.Y.
2001)), aff'd sub nom. Alexander v. The Bd. of Educ. of City of
N.Y., 648 F. App'x 118 (2d Cir. 2016). Plaintiff has presented
no direct evidence of retaliatory animus, and has not
established a causal nexus through either temporal proximity or
disparate treatment.

To start, as described above, the gravamen of Plaintiff's allegations of discriminatory actions reside in the aftermath of Plaintiff's return from FMLA leave in August 2014, but the many months between those actions and her eventual termination in December 2014 "militates against an inference of causation." Kim v. Goldberg, Weprin, Finkel Goldstein, LLP, 862 F. Supp. 2d 311, 319 (S.D.N.Y. 2012) (citing Kamrowski v. Morrison Mgmt. Specialist, No. 05 Civ. 9234 (KMK), 2010 WL 3932354, at *22 (S.D.N.Y. Sept. 29, 2010) (collecting cases)); see also O'Reilly v. Consol. Edison Co. of N.Y., 173 F. App'x 20, 22 (2d Cir. 2006) (holding that a three-month gap between FMLA leave and termination insufficient to create an inference of retaliation). Moreover, Phillips' comments and actions, like that Plaintiff was "stuck in second gear" and requiring Plaintiff to take assessments, actions which indicate and appear motivated by Phillips' impressions and displeasure of Plaintiff's performance, do not evince the necessary relationship to Plaintiff taking FMLA leave. See Tomassi v. Insignia Fin. Grp., Inc., 478 F.3d 111, 115 (2d Cir. 2007) ("[T]he more remote and oblique the remarks are in relation to the employer's adverse action, the less they prove that the action was motivated by discrimination."), abrogated on other grounds by, Gross v. FBL Fin. Servs., Inc., 557 U.S. 167 (2009). Lastly, Plaintiff did

return to work without any restrictions or established change in her work responsibilities, and a "return to work after [a] leave counters any inference of discrimination." Alexander, 107 F. Supp. 3d at 330 (citing LeBoeuf v. N.Y. Univ. Med. Ctr., No. 98 Civ. 973 (JSM), 2000 WL 1863762, at *4 (S.D.N.Y. Dec. 20, 2000) ("[E]ven if one accepts as true that [an employer] was angry because Plaintiff took his leave at a critical time, the fact that [Plaintiff] was reinstated despite [the] alleged displeasure gives rise to the inference that [the manager's] anger at Plaintiff was not the reason for his termination.")). Phillips actions, "without more, are insufficient to salvage plaintiff's lawsuit on summary judgment." Muhleisen v. Wear Me Apparel LLC, 644 F. Supp. 2d 375, 388 (S.D.N.Y. 2009).

Plaintiff argues that a temporal connection exists by looking to the time between her taking FMLA leave and Phillips informing GSK of Plaintiff's side businesses. In certain circumstances, actions taken around the time of an initiation of an investigation that ultimately results in termination can create such an inference. See Barney v. Consol. Edison Co. of N.Y., No. 99 Civ. 823 (DGT) (SMG), 2009 WL 6551494, at *12 (E.D.N.Y. Oct. 1, 2009) (accepting as plausible a theory of retaliation where plaintiff alleged other employees had "set her

up" prior to an investigation as part of a larger course of conduct culminating in plaintiff's termination), aff'd, 391 F. App'x 993 (2d Cir. 2010). What is to guide district courts is the "permissible inferences that can be drawn from temporal proximity in the context of particular cases." Espinal v. Goord, 558 F.3d 119, 129-30 (2d Cir. 2009). Yet even looking at events back June 2014 and considering that temporality does not establish the necessary retaliatory inference Plaintiff seeks.

Viewed in the light most favorable to Plaintiff, no favorable inference exists here. The undisputed facts show that Plaintiff requested FMLA leave, which GSK granted; around the same time, Phillips learned that Plaintiff had side businesses, which she promptly reported to GSK. Plaintiff has put forward no evidence, other than an email from Phillips complaining about the number of GSK employees taking leave and commenting that "when it rains it pours," to suggest intent, and nothing but her own "speculation" that that LaFontant and Phillips were part of a broader plan to have Plaintiff terminated. Zito v. Fried, Frank, Harris, Shriver & Jacobson, LLP, 869 F. Supp. 2d 378, 401 (S.D.N.Y. 2012); see also (Pl. Dep. 121:4-9).[3] LaFontant's newly

---

[3]    For similar reasons, Plaintiff's citation to Terry v. Cnty. of Cayuga, No. 11 Civ. 1296 (LEK) (ATB), 2013 WL 5464395, at *9 (N.D.N.Y. Sept. 30, 2013), is unavailing. There, the court noted

presented information to Phillips, which Phillips shortly
thereafter acted upon, provides a "legitimate intervening basis"
for the instigation of an investigation against Phillips. Fraser
v. Fiduciary Tr. Co. Int'l, No. 04 Civ. 6958 (PAC), 2009 WL
2601389, at *6 (S.D.N.Y. Aug. 25, 2009), aff'd, 396 F. App'x 734
(2d Cir. 2010).


Plaintiff also has not provided evidence of disparate
treatment. In her motion papers, Plaintiff puts forward as proof
two other GSK sales representatives that had side businesses who
were not terminated: one who was "a real estate agent" and one
who "was also an independent contractor for Advocare." (Pl.'s
Opp. at 16; see also Pl. Dep. 194:6-25.) No evidence has been
adduced that establishes that Defendants were aware of these
other employees' side businesses or, of equal importance, that
Plaintiff and either of them were similarly situated "in all
material respects." Shumway v. United Parcel Serv., Inc., 118
F.3d 60, 64 (2d Cir. 1997); see also (Pl. Dep. 202:14-204:2;
Pl.'s Opp. at 16). Without any additional information,

---

that the record contained evidence that a report by a co-worker
about the terminated plaintiff was manufactured to support the
decision of the plaintiff's manager, who had a meaningfully
close social and professional relationship with the reporting
co-worker. Id. No evidence remotely suggesting such a
relationship has been adduced here.

Plaintiff's attempt to show disparate treatment must fail. See Risco v. McHugh, 868 F. Supp. 2d 75, 104 (S.D.N.Y. 2012) ("Without the necessary evidence of similarly situated comparators, [plaintiff] cannot meet her burden of demonstrating facts that give rise to an inference of discrimination on the basis of race or color under a disparate impact theory."); Mattera v. JPMorgan Chase Corp., 740 F. Supp. 2d 561, 575 (S.D.N.Y. 2010) ("[P]laintiff's 'feelings' and 'beliefs' are no substitute for persuasive evidence that identifiable, valid comparators were treated in a meaningfully different manner." (citation omitted)).

In sum, Plaintiff has not made a *prima facie* showing. Nevertheless, out of an abundance of caution, a review of Defendants' justification for Plaintiff's termination and possible pretext will also be performed. See Kaiser v. Zurich N. Am., No. 12 Civ. 6763 (VSB), 2015 WL 13360299, at *8 (S.D.N.Y. Mar. 31, 2015) (rejecting plaintiff's prima facie case but continuing to analyze defendant's termination reasoning on summary judgment).

### b. The Reasons for Termination Were Not Pre-textual

Assuming, *arguendo*, that Plaintiff has met her burden to make out a *prima facie* case, the next stage to consider is whether Defendants have proffered a legitimate, nondiscriminatory reason for Plaintiff's termination. In response, Defendants put forward that they terminated Plaintiff's employment for her violation of GSK's corporate policy prohibiting "actual or potential conflicts of interest." (Harris Decl., Ex. A, at 9.) Based on the evidence presented with regard to Plaintiff's health and nutrition side businesses in the context of GSK conflict of interest policies, this argument, "taken as true, would permit the conclusion that there was a nondiscriminatory reason" for their action. Holcomb, 521 F.3d at 141 (quoting St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 509 (1993)). Thus, Defendants have fulfilled the second stage of the McDonnell Douglas framework, shifting the burden back to Plaintiff.

To rebut the legitimate reasons for her discharge, Plaintiff must, without the benefit of any presumptions, show that a reasonable jury could conclude by a preponderance of the evidence that her "disability was at least 'a motivating factor'

for the adverse employment action." Anderson v. Nat'l Grid, PLC, 93 F. Supp. 3d 120, 140 (E.D.N.Y. 2015) (quoting Hong Yin v. N. Shore LIJ Health Sys., 20 F.Supp.3d 359, 371-72 (E.D.N.Y. 2014)) (citing Parker v. Columbia Pictures Indus., 204 F.3d 326, 336-37 (2d Cir. 2000)); see also Alexander, 648 F. App'x at 122 (citation omitted) (stating that, on the third stage, a plaintiff must "(1) adduce 'evidence to a show that the proffered explanation was pretextual,' or (2) 'identify inconsistencies or implausibilities in that proffered reason'). Even if Plaintiff had established a *prima facie* case of FMLA retaliation, she would still be unable to rebut Defendants' stated nondiscriminatory justification.

Plaintiff supports her claim of pretext with similar evidence that supported her claim for an inference of discrimination, principally pointing to the timing of Phillips' request to start a GSK investigation relative to Plaintiff taking FMLA leave and Phillips comments to Plaintiff upon Plaintiff's return.[4] Plaintiff also argues that Phillips was

---

[4]    To the extent that Plaintiff again asserts claims about two different GSK employee comparators who had side businesses while GSK employees but, unlike Plaintiff, were not terminated, they do not establish that Plaintiff's taking of FMLA leave was a motivating factor in her termination and is again rejected for reasons already discussed supra.

involved in the decision to terminate Plaintiff and that, given Plaintiff's performance at GSK, without such interference, Plaintiff would otherwise have not been terminated.

Undergirding each of Plaintiff's contentions is the undisputed fact that Plaintiff operated a health and nutrition business on the side while a pharmaceutical sales representative of GSK. After an investigation, performed by GSK's Corporate Investigations Team and ERAT, GSK determined Plaintiff was in violation of GSK's corporate policies that prohibit employees from actual or potential conflicts of interest. When evaluating Plaintiff's rebuttal in the context of this background, "it is not the function of a fact-finder to second-guess business decisions." Soderberg v. Gunther Int'l, Inc., 124 F. App'x 30, 32 (2d Cir. 2005) (quoting Dister v. Cont'l Group, Inc., 859 F.2d 1108, 1116 (2d Cir. 1988). The question is, rather, whether Plaintiff has shown evidence that the decision is "so lacking in merit as to call into question its genuineness." Dister, 859 F.2d at 1116 (collecting cases). As no evidence adduced has established that the termination of Plaintiff's employment was for any reason other than her violation of GSK's policy prohibiting actual or potential conflicts of interest, for

similar reasons as stated above, Plaintiff's arguments are again unavailing.[5]

First, Plaintiff's claims about her high work performance and purported ability to balance her side businesses and other GSK work are the kinds of "subjective view[s]" that do "not create a genuine issue of material fact." Morris v. Ales Grp. USA, Inc., No. 04 Civ. 8239 (PAC) (THK), 2007 WL 1893729, at *10 (S.D.N.Y. June 29, 2007) (citing Holt v. KMI-Cont'l, Inc., 95 F.3d 123, 130 (2d Cir. 1996)).

Second, Phillips comments about Phillips, both to Plaintiff and to GSK employees, do not establish Plaintiff's claims. As already noted, many of Phillips's actions, such as her email comment that "when it rains it pours" and comments and actions about Plaintiff's work performance upon Plaintiff's return from

---

[5]    As it is not disputed by Plaintiff that she did have nutrition and health side businesses, which is Defendants' stated reason for Plaintiff's termination, the facts established here render many of Plaintiff's cited authorities inapposite. See Yang v. Navigators Grp., Inc., 674 F. App'x 13, 15 (2d Cir. 2016) (finding a triable issue of fact where "[plaintiff] and her supervisors here offered substantially different accounts of her October 26, 2012 presentation [the alleged reason by defendant for plaintiff's termination]"); Sharkey v. JPMorgan Chase & Co., 660 F. App'x 65, 68 (2d Cir. 2016) (finding triable issue of fact when plaintiff showed defendants provided "shifting rationales" for termination along with evidence temporal proximity).

35

FMLA leave either have reasonable non-retaliatory explanations or, even if viewed in the most favorable light to Plaintiff, amount only to the kinds of unpleasant yet unavoidable interactions endemic to professional life and, without additional, more concrete evidence, "shed[ ] no light on the ultimate decision to terminate [plaintiff]." Stuart v. T-Mobile USA, Inc., No. 14 Civ. 4252 (JMF), 2015 WL 4760184, at *6 (S.D.N.Y. Aug. 12, 2015); see also Bowman v. CSX Transp., Inc., 22 F. Supp. 3d 181, 194 (N.D.N.Y. 2014) (supervisor's concerns about the performance and actions of an individual using FMLA leave is not "evidence that [the defendant] negatively viewed [the plaintiff's FMLA] leave"). Furthermore, while evidence has shown that Phillips made comments to Plaintiff and about Plaintiff while providing requested information about Plaintiff to GSK investigators and employees, no evidence has been adduced that Phillips was involved with the actual decision-making of the two different GSK teams that investigated and ultimately terminated Plaintiff. See Campbell v. Alliance Nat'l Inc., 107 F. Supp. 2d 234, 247 (S.D.N.Y. 2000) (finding "isolated and stray" comments made by a non-decision maker insufficient to establish animus, granting summary judgment, and collecting cases).

Thirdly, Plaintiff's argument as to the temporality between Phillips' report to GSK and Plaintiff's FMLA leave cannot support Plaintiff's retaliation claim. No evidence, other than Plaintiff's conjectures, suggests that Phillips, in reporting Plaintiff to GSK, was motivated by anything other than learning for the first time about Plaintiff's side businesses back in June 2014. With no additional evidence, "[t]he timing of events alone, even if sufficient to meet the plaintiff's *prima facie* burden, cannot defeat summary judgment in the face of defendant's proffered legitimate reason." Vosatka v. Columbia Univ., No. 04 Civ. 2936 (LAP), 2005 WL 2044857, at *10 (S.D.N.Y. Aug. 25, 2005) (citation omitted).

In sum, as Plaintiff has failed both to establish either a *prima facie* case of retaliation or that her taking of FMLA was a motivating factor in Defendants' termination of her employment in opposition to Defendants' proffered non-retaliatory explanation, Defendants' motion for summary judgment as to the Amended Complaint's Count I is granted.

37

ii. NYSHRL Discrimination Has Not Been Established

Plaintiff also contends that Defendants discriminated
against her on the basis of a disability or perceived disability
in violation of the NYSHRL. Analysis of claims made under the
NYCHRL requires a separate and independent analysis from any
federal and state law claims, and is construed "broadly in favor
of discrimination plaintiffs, to the extent that such a
construction is reasonably possible." Mihalik v. Credit Agricole
Cheuvreux N. Am., Inc., 715 F.3d 102, 109 (2d Cir. 2013). To
establish a claim of disability discrimination under the NYSHRL,
Plaintiff must first establish a *prima facie* case by showing
that she: (1) was actually or perceived to be legally disabled;
(2) was qualified for her job; (3) suffered a materially adverse
employment action; and (4) that such action occurred under
circumstances giving rise to an inference of discrimination.
Forrest v. Jewish Guild for the Blind, 3 N.Y.3d 295, 305 (2004).
If a *prima facie* showing is made, the same burden-shifting
framework as under a FMLA claim is applied. See Yetman v. Cap.
Dist. Transp. Auth., 669 F. App'x 594, 595 (2d Cir. 2016).

Under New York State law, a legally recognized disability
requires showing:

38

(a) a physical, mental or medical impairment resulting from anatomical, physiological, genetic or neurological conditions which prevents the exercise of a normal bodily function or is demonstrable by medically accepted clinical or laboratory diagnostic techniques or (b) a record of such an impairment or (c) a condition regarded by others as such an impairment, provided, however, that in all provisions of this article dealing with employment, the term shall be limited to disabilities which, upon the provision of reasonable accommodations, do not prevent the complainant from performing in a reasonable manner the activities involved in the job or occupation sought or held.

N.Y. EXEC. LAW § 292(21).

To obtain summary judgment on a NYCHRL claim, a defendant must show that "no jury could find defendant liable under any of the evidentiary routes: under the McDonnell Douglas test, or as one of a number of mixed motives, by direct or circumstantial evidence." Gioia v. Forbes Media LLC, 501 F. App'x 52, 56 (2d Cir. 2012). In NYCHRL cases, "summary judgment is appropriate if the record establishes as a matter of law that discrimination or retaliation played no role in the defendant's actions." Ya-Chen Chen v. City Univ. of N.Y., 805 F.3d 59, 76 (2d Cir. 2015) (internal quotation marks and alterations omitted) (quoting Mihalik, 715 F.3d at 110 n.8).

Plaintiff argues that she was diagnosed by Hartwig with anxiety, depression, and compulsive disorder, establishing an actual disability, and that she suffered a breakdown in front of Phillips in addition to having discussions with co-workers about her work-induced stress, which would cause Defendants to perceive Plaintiff as having a disability.[6] (See Pl. Dep. 147:5-159:7, 166:19-167:13; Pl.'s Opp. at 17-18.) However, none of Plaintiff's arguments have been established by the evidence presented.

First, the proffered records from Hartwig are "Progress Reports" that merely indicate observations of Hartwig and do not clearly establish any diagnoses made. (See Boland Aff., Ex. L.) Plaintiff has put forward no evidence that reasonably demonstrates her anxiety, stress, or compulsions "prevent[ed] the exercise of a normal bodily function" or otherwise prevented Plaintiff from performing her job at GSK. N.Y. EXEC. LAW § 292(21). Hartwig's observations are undercut further by the

---

[6] Plaintiff's claim in her motion papers of a stress-related heart issue, raised for the first time in the briefing and contradicting previous sworn deposition testimony, is necessarily rejected. See Giaccio v. City of N.Y., 502 F. Supp. 2d 380, 389 (S.D.N.Y. 2007) ("This new claim of disability, first introduced in Plaintiff's brief in opposition to the instant motion, contradicts his deposition testimony and must be disregarded.") aff'd, 308 F. App'x 470 (2d Cir. 2009).

40

undisputed fact that Plaintiff returned to work with no restrictions on her ability to do her job and at Hartwig's direction. See Nowak v. EGW Home Care, Inc., 82 F. Supp. 2d 101, 111 (W.D.N.Y. 2000) (dismissing a NYSHRL disability discrimination claim because, while "plaintiff was 'placed on disability leave by her doctor' because of stress caused by the defendants[,] . . . [t]here are no additional facts alleged from which a reasonable inference can be drawn that plaintiff suffers from a 'medically diagnosable impairment' within the meaning of the [NYSHRL]"). Moreover, even if Hartwig had in fact diagnosed Plaintiff with work-related stress or anxiety, such conditions have been recognized as not actionable to bring a NYSHRL disability discrimination claim. See Lenhoff v. Getty, No. 97 Civ. 9458 (LMM), 2000 WL 977900, at *7 (S.D.N.Y. July 17, 2000) ("[J]ob-induced stress cannot be considered a disability under the NYSHRL . . . .") (collecting cases); Raisley v. First Manhattan Co., 4 Misc. 3d 1022(A), at *4 n.3 (N.Y. Sup. Ct., Sept. 9, 2004) ("In general, claims of disability resulting from stress caused by a particular supervisor have not been well-received.") (collecting cases).

As to the evidence put forward by Plaintiff about her conversations with other GSK employees and her singular

breakdown in front of Phillips, such examples only provide Plaintiff the fuel for conjecture that Defendants might have perceived Plaintiff as possessing a disability rather than demonstrating affirmatively that Defendant did have this perception. Conjecture is not enough to sustain a NYSHRL discrimination claim; "[t]o establish discrimination based on perceived disability, a plaintiff must show that his employer perceived him as having a disability." Thomsen v. Stantec, Inc., 483 F. App'x 620, 622 (2d Cir. 2012) (emphasis added); see also Karam v. Cty. of Rensselaer, N.Y., No. 13 Civ. 1018 (MAD) (DJS), 2016 WL 51252, at *17 (N.D.N.Y. Jan. 4, 2016) (quoting Thomsen, 483 F. App'x at 622, and noting that NYSHRL claims are analyzed in the same fashion as Thomsen's ADA claim). Plaintiff has not shown this.

Lastly, for similar reasons described above, Plaintiff has not established a *prima facie* showing that the termination of her employment occurred under circumstances giving rise to an inference of discrimination. See Section III(i)(a)-(b) supra. Plaintiff has put forward no evidence that evinces, even in the light most favorable to her, that Defendants' decision to terminate her employment was based on her alleged stress, anxiety, and compulsion rather than Defendants' proffered

explanation of Plaintiff's side businesses. See Shimanova v.
TheraCare of N.Y., Inc., No. 15 Civ. 6250 (LGS), 2017 WL 980342,
at *6 (S.D.N.Y. Mar. 10, 2017) (failing to find *prima facie* case
for NYSHRL claim when allegations were supported statements that
were "ambiguous and temporally removed from the termination, and
[which] shed[ ] no light on whether the actual decision to
discharge [p]laintiff was motivated by any kind of
discriminatory intent" (original alternations omitted));
Rozenfeld v. Dep't of Design & Construction of the City of N.Y.,
No. 10 Civ. 4002 (WFK) (LB), 2012 WL 2872157, at *10 (E.D.N.Y.
Jul. 12, 2012) (holding that plaintiff failed to establish
inference of discrimination at the *prima facie* stage where
evidence showed "nobody made disparaging comments about
[plaintiff's] [protected class]").

As Plaintiff has neither established that she possessed a
disability protected by the NYSHRL nor that the circumstances
under which she was terminated give rise to an inference of
disability discrimination, Defendants' motion for summary
judgment as to the Amended Complaint's Count II and III is
granted.

43

## Conclusion

For the foregoing reasons, Defendants' motion for summary judgment is granted.

It is so ordered.

**New York, NY**
**September 14, 2017**

_____
ROBERT W. SWEET
U.S.D.J.